UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| ANGELINA POVEY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 4:09-cv-161-RLY-WGH |
| | ) | |
| CITY OF JEFFERSONVILLE, | ) | |
| Defendant. | ) | |

**ENTRY ON THE CITY OF JEFFERSONVILLE'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Angelina Povey ("Plaintiff"), was employed as an adoption assistant/kennel attendant for the City of Jeffersonville (the "City") at its animal shelter. Following her termination, Plaintiff filed the present lawsuit against the City, alleging that the City discriminated against her in violation of the Americans With Disabilities Act ("ADA"), and retaliated against her for complaining of disability harassment. For the reasons set forth below, the court **GRANTS** the City's motion.

**I.   Facts**

    **A.   Background**

1. The City of Jeffersonville's animal shelter employed the following individuals: (1) the shelter's director, Harry Wilder ("Wilder"); (2) an office manager, Cindy Kaiser; (3) an animal control officer, Michael Wright ("Wright"); and (4) three adoption assistants/kennel attendants: Plaintiff, Louis Hancock ("Hancock"), and

1

Travis Jackson ("Jackson"). (Deposition of Kim Calabro ("Calabro Dep.") at 23-24, 29; Deposition of Harry Wilder ("Wilder Dep.") at 19).

2. The shelter housed a reception room, offices, a "puppy room," a "cat room," a kennel where the adult dogs are housed, a storage room, an infirmary room, the surgery room, and a garage. (Wilder Dep. at 16-18).

3. The adoption assistant/kennel attendant was responsible for cleaning all of the rooms in the shelter (as noted above), feeding the animals, transporting the animals within the facility, and assisting with adoptions. (Wilder Dep. at 15-16; Defendant's Ex. C). The job description noted that the position "may require the [employee] to lift objects heavier than 30 pounds for extended periods." (Defendant's Ex. C. *But see* Wilder Dep. at 38-39 (testifying that an employee did not have to lift 30 pounds "for an extended period").

4. The shelter is open Monday through Saturday, and closed on Sunday. Two or three adoption assistants/kennel attendants worked from Monday through Friday, and one was assigned to work on Saturday (with the office manager) and Sunday (alone). (Wilder Dep. at 20-22). As such, Plaintiff was required to work every third weekend. (Deposition of Angelina Povey ("Plaintiff Dep." at 33-34)).

**B. Plaintiff's Injury**

5. In October 2007, Plaintiff injured her right wrist while moving a dog from one cage to another cage. (Plaintiff Dep. at 21-23). Plaintiff's doctor informed her that she could return to work on "one-handed duty." (Plaintiff Dep. at 24).

6. Plaintiff reported her injury to the City, and her treatment was paid by workers compensation insurance. (Calabro Dep. at 13-15).

### C. Accommodations and Work Restrictions

7. Kim Calabro ("Calabro"), the City's Human Resources Director, testified that the City has an anti-discrimination policy that requires the City to consider an accommodation to a disabled employee. (Calabro Dep. at 30).

8. Shortly after Plaintiff's injury, Calabro and Wilder met to discuss Plaintiff's condition. During the conversation, Calabro informed Wilder that he did not have to place Plaintiff on light duty because the City "typically" does not have a light duty policy, and it was Calabro's impression that Plaintiff was not disabled. (Calabro Dep. at 8, 33-35).

9. Wilder "didn't want to see her out of a job" because she had a young child, so he allowed Plaintiff to continue to work. (Wilder Dep. at 73; Calabro Dep. at 35).

10. Due to her work restriction, Plaintiff, Hancock, and Jackson came to an agreement that Plaintiff would work only the cat room and the infirmary. (Wilder Dep. at 30-31).

11. Plaintiff was unable to work in the puppy room because she could not lift the blue trays located at the bottom of the puppy kennels to clean them. She also could not work in the kennel because she could not open the cage and spray the dogs down with only one hand. (Plaintiff Dep. at 42, 44-45).

12. Plaintiff was also unable to work weekends by herself, as that would entail

cleaning the entire facility, including the blue trays in the puppy room and the kennel room. (Plaintiff Dep. at 44-45, 96). This left Hancock and Jackson to work every other weekend instead of every third weekend. (Plaintiff Dep. at 96). Hancock and Jackson were not happy about the change in their work schedules. (Calabro Dep. at 99-100; Wilder Dep. at 79; Plaintiff Dep. at 80).

### D. Plaintiff's Surgery

13. Plaintiff had surgery on her wrist on April 8, 2008, and took a week vacation to recuperate. (Plaintiff Dep. at 25).

### E. Plaintiff's Complaints of Discrimination

14. In May of 2008, Plaintiff complained to Calabro that Hancock was harassing her because of her work restrictions. (Calabro Dep. at 20-21; Plaintiff Dep. at 66-67).

15. Calabro then contacted Carol Dawson ("Dawson"), a human resources consultant and a former employee of the Equal Employment Opportunity Commission ("EEOC"), to ask her to perform an investigation. (Calabro Dep. at 24-25).

16. Dawson interviewed all of the employees at the shelter and provided an official copy of her findings. (Calabro Dep. at 58-59). Dawson did not find that Hancock was illegally harassing Plaintiff, but, as a result of the investigation, a policy was put in place at the shelter wherein Plaintiff and Hancock would not be in the same room together. (Defendant's Ex. E). Wilder told both Plaintiff and Hancock that they could be terminated for violating the policy. (Calabro Dep. at 71-72).

17. After the investigation, Plaintiff felt that she was being harassed (although not to

her face), and reported that to Calabro. (Calabro Dep. at 113-14; Plaintiff Dep. at 67). Plaintiff also told Calabro that she was going to file a charge with the EEOC, however, she did not file a charge until after her termination. (Plaintiff Dep. at 103-05).

18. After Plaintiff's second complaint, Calabro instructed Wilder to tell Hancock that if he did not stop his conduct towards her, he could be terminated. (Calabro Dep. at 114).

19. Plaintiff last complained of Hancock's conduct on August 8, 2008. (Calabro Dep. Ex. 8).

### F. Plaintiff's Permanent Work Restrictions and Termination

20. In August of 2008, Calabro received notice from Plaintiff's physician that Plaintiff was being released from treatment, had a PPI of 25%[1] for her right arm, and a permanent right arm lifting, pushing, and pulling restriction of five pounds and no repetitive right hand movement. (Calabro Dep. at 19; Wilder Dep. at 80; Plaintiff Dep. at 24).

21. After the City learned of Plaintiff's restrictions, Wilder placed Plaintiff on leave with pay beginning August 28, 2008. (Plaintiff Dep. at 99-100).

22. A meeting was held with Calabro, Wilder, City Attorney Larry Wilder, and the City's Human Resources consultant during which the job description of an

---

[1] The parties agree that her PPI rating was 25%; however, the court is unable to substantiate that fact in the record.

adoption assistant/kennel attendant was examined and Plaintiff's restrictions were discussed. (Calabro Dep. at 41-44, 47-48). The parties' determined that with a permanent five pound right arm lifting restriction, Plaintiff was not able to perform the essential functions of her position. (Calabro Dep. at 39, 53; Wilder Dep. at 46).

23. Following the meeting, Plaintiff's employment was terminated. (Calabro Dep. at 108-09).

### G. Plaintiff's Daily Activities

24. Plaintiff testified that since her injury, she needs assistance with cooking (lifting pans, chopping vegetables, and the like), and can wash dishes for about five minutes at a time. (Plaintiff Dep. at 18-19).

25. If she overuses her wrist, she needs to rest it for about forty-five minutes and "[w]ork with it, keep it straight, relax it." If she does not take a break when needed, her wrist "is dead for me for the rest of the day." (Plaintiff Dep. at 19).

26. Plaintiff can do laundry and can vacuum with her left hand. (Plaintiff Dep. at 19).

27. Plaintiff needs assistance getting out of the bathtub by herself, and, at times, with washing her hair. (Plaintiff Dep. at 20).

28. Plaintiff cannot brush her seven year old daughter's hair or apply sunscreen to her face. (Plaintiff Dep. at 20).

29. Plaintiff is able to pick up a two-liter bottle and a gallon of milk, but needs the assistance of her left hand to pour the contents into a cup. (Plaintiff Dep. at 25).

## II. Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movant. *See Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir. 1992). The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party. *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003). The moving party bears the burden of demonstrating the "absence of evidence on an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The non-moving party may not, however, simply rest on the pleadings, but must demonstrate by specific factual allegations that a genuine issue of material fact exists for trial. *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994) (citing *Celotex*, 477 U.S. at 322)).

## III. Discussion

### A. ADA Claim

Congress amended the ADA's definition of "disability" in the ADA Amendments Act ("ADAAA") of 2008. The effective date of the legislation is January 1, 2009, so it

7

does not apply to this case. *Kiesewetter v. Caterpillar Inc.*, 295 Fed.Appx. 850, 851 (7th Cir. 2008). Therefore, in analyzing Plaintiff's ADA claims, the court "use[s] the laws and interpretations that were in force when the complained-of acts occurred." *Id*. That interpretation includes two cases that were expressly overturned by the ADAAA: *Toyota Motor Manuf. v. Williams*, 534 U.S. 184 (2002) and *Sutton v. United Airlines, Inc.*, 527 U.S. 471 (1999).

Plaintiff brings two claims under the ADA: failure to accommodate and disparate treatment. To state a prima facie case of disability discrimination, Plaintiff must show: "(1) that she is disabled; (2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) that the employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation." *Stevens v. Illinois Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000) (citing 42 U.S.C. §§ 12111-12). The threshold issue, of course, is whether Plaintiff was disabled within the meaning of the ADA.

Title I of the ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is defined by the ADA to mean "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds

or desires." 42 U.S.C. § 12111(8).

The term "disability" is defined under the ADA to mean, with respect to an individual:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). A plaintiff seeking protection under the ADA bears the burden of showing that she is "disabled." *Hamm v. Runyon*, 51 F.3d 721, 724 (7th Cir. 1995). Here, Plaintiff proceeds under (A) and (C) above.

### 1. Whether Plaintiff is Disabled

An impairment rises to the level of a disability under the ADA only if it "substantially limits" a major life activity. *Baulos v. Roadway Exp., Inc.*, 139 F.3d 1147, 1151 (7th Cir. 1998). Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). "'Major life activities' thus refers to those activities that are of central importance to daily life." *Toyota*, 534 U.S. at 197. In general, "substantially limited" refers to the inability to perform a major life activity as compared to the average person in the general population or a significant restriction "as to the condition, manner, or duration" under which an individual can perform a particular activity. 29 C.F.R. § 1630.2(j). "Substantial," as defined by the *Toyota* Court, "suggests 'considerable' or 'to a

9

large degree.'" *Toyota*, 534 U.S. at 196 (quoting Webster's Third New International Dictionary 2280 (1976)). Here, Plaintiff alleges that she is disabled in the major life activities of performing manual tasks and caring for oneself. For purposes of this case, there is no discernable difference between the two major life activities.

In *Toyota*, the Court considered whether the plaintiff, who suffered from carpel tunnel syndrome amongst other neck and shoulder ailments, was substantially limited in the major life activity of performing manual tasks. 534 U.S. at 196. The record before the Court indicated that, "even after her condition worsened, she could still brush her teeth, wash her face, bathe, tend her flower garden, fix breakfast, do laundry, and pick up around the house." *Id*. at 202. Although the record indicated that plaintiff's "medical conditions caused her to seek help dressing, and to reduce how often she plays with her children, gardens, and drives long distances," these changes "did not amount to such severe restrictions in the activities that are of central importance to most people's daily lives that they establish a manual task disability as a matter of law." *Id*.

In *Casey v. Kwik Trip, Inc.*, the Seventh Circuit considered whether the plaintiff, who suffered from carpel tunnel syndrome and Raynaud's disease, was substantially limited in the major life activity of performing manual tasks. 114 Fed.Appx. 215, 216-18 (7th Cir. 2004). Plaintiff claimed that her ailments prevented her from knitting, crocheting, sewing, and braiding her own hair. *Id*. at 219. Plaintiff also claimed that she was "*severely* restricted in her ability to perform household chores such as draining pots, scrubbing a floor, vacuuming, painting, making a bed, and shoveling snow, and other

10

activities such as driving, gripping, writing, and holding small objects such as jewelry and keys." *Id*. (emphasis in original). The Court rejected her ADA claim against her former employer, citing the fact that she was able to perform these tasks by using "simple, common-sense, and efficient adaptative measures," such as using her left hand or both hands to drain pots, use tools and manipulate small objects. *Id*.

Like the plaintiff in *Casey*, Plaintiff testified that she can perform many activities central to most people's daily lives with the assistance of "simple, common-sense, and efficient adaptative measures." For example, Plaintiff testified that she can cook, bathe, and wash her hair with the assistance of her husband or daughter; can lift a two-liter bottle or gallon of milk with the assistance of her left hand; and can vacuum, and do laundry with her left hand. Although Plaintiff testified that she is not able to brush her daughter's hair or apply sunscreen to her daughter's face, there is no reason why she could not use her left hand to perform these tasks. Although she must rest her wrist and exercise her wrist if it fatigues, the court finds, based on this record, that Plaintiff's wrist injury is not an impairment "that prevents or severely restricts [her] from doing activities that are of central importance to most people's daily lives." *Toyota*, 534 U.S. at 198.

### 2. Whether Plaintiff is Regarded As Disabled

To fall within the statutory definition of the regarded as prong (C) above, a plaintiff must show that "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially

limits one or more major life activities." *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 489 (1999); *Mack v. Great Dane Trailers*, 308 F.3d 776, 780 (7th Cir. 2002). The purpose of the "regarded as" prong is to prohibit employers from making ill-informed decisions based on myth or stereotype. *Sutton*, 527 U.S. at 489 (citing *School Bd. of Nassau City v. Arline*, 480 U.S. 273, 284 (1987)) ("By amending the definition of 'handicapped individual' to include not only those who are actually physically impaired, but also those who are regarded as impaired and who, as a result, are substantially limited in a major life activity, Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment").

### a. Major Life Activity of Working

Plaintiff's claim is that the City regarded her as being substantially limited in the major life activity of working a broad class of jobs. 29 C.F.R. § 1630.2(j)(3). With respect to the activity of "working," an individual must be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(i)). "The inquiry is an individualized one: whether this plaintiff's impairment constitutes a significant barrier to his employment." *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 953 (7th Cir. 2000). Factors the court may consider include: "the number and type of jobs from which the impaired individual is disqualified, the geographical area to which the individual has reasonable access, and the individual's

job expectations and training." *Id.* (internal quotation marks and citation omitted).

"A demonstrated 'inability to perform a single, particular job' does not render an individual substantially limited in the major life activity of working." *Squibb v. Memorial Ctr.*, 497 F.3d 775, 782 (7th Cir. 2007) (quoting 29 C.F.R. § 1630.2(j)(3)(i)). Rather, the plaintiff must present "some evidence of general employment demographics and/or of recognized occupational classifications that indicate the approximate number of jobs . . . from which an individual would be excluded because of an impairment." *Peters v. City of Mauston*, 311 F.3d 835, 843 (7th Cir. 2002). "This is not an onerous requirement, but it does require at least some evidence from which one might infer that [the Plaintiff] faced 'significant restrictions' in her ability to meeting the requirements of other jobs." *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 507 (7th Cir. 1998).

While the evidentiary requirement is not "onerous," Plaintiff has not set forth any evidence from which the court can determine whether Plaintiff's perceived impairment forecloses her from accepting a few, many, or most of the jobs in a particular class or in a broad range of classes. Without some evidence to show that Plaintiff is precluded from performing a class of jobs or a broad range of jobs in various classes, Plaintiff's perceived impairment does not meet the definition of a disability under the ADA.

      **b.**  **Major Life Activity of Performing Manual Tasks**

Plaintiff also claims that the City perceived her as substantially limited in the major life activity of performing manual tasks. In support of her claim, Plaintiff cites to statements made by Calabro and Wilder regarding Plaintiff's lifting restriction which,

13

Plaintiff contends, suggest that they believed she was foreclosed from performing manual tasks.

Calabro testified that it was her understanding that Plaintiff "wasn't able to use her right hand." (Calabro Dep. at 82). She also testified that it was her impression, based on Wilder's comments, that Plaintiff "wasn't able to do a whole lot of anything," including cleaning the cages and floors, due to her lifting restriction. (Calabro Dep. at 84-85).

Wilder testified that he was aware that Plaintiff had a lifting restriction of five pounds. (Wilder Dep. at 45). This meant, in his opinion, that Plaintiff "couldn't do [her job]." (Wilder Dep. at 46). Wilder explained:

> Q: All right. But, why do you think that?
>
> A: Because every job out there had – has a weight capacity.
>
> Q: And, the weight capacity we're talking about, again, is the issue with respect to lifting dog food or cat food or kitty litter?
>
> A: Or –
>
> Q: And, occasionally, a big dog?
>
> A: Or whatever. Anything that would weigh more than five pounds. Whether it be a vacuum cleaner or a bucket of water or . . .

(Wilder Dep. at 46).

Contrary to Plaintiff's assertion, these comments merely reflect the fact that Plaintiff was unable to perform her particular job. They do not show that Calabro and Wilder perceived Plaintiff as being substantially limited in the performance of those manual tasks that are of central importance to most people's lives, such as brushing her

14

teeth, washing her face, bathing, doing laundry, and the like. *See Toyota*, 534 U.S. at 202. Without some evidence of Calabro's and Wilder's views on this subject, Plaintiff's perceived impairment does not meet the definition of a disability under the ADA.

### 3. Qualified Individual

In addition, Plaintiff cannot prevail on her ADA claim because she cannot show she is a qualified individual with a disability. The ADA defines a qualified individual with a disability as "an individual with a disability who, with, or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Whether an individual is qualified must be made 'as of the time of the employment decision.'" *Koshinski v. Decatur Foundry, Inc.*, 177 F.3d 599, 602 (7th Cir. 1999) (quoting *Ross v. Indiana State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1013 (7th Cir. 1998)). The plaintiff bears the burden of proof on the issue of qualification. *Id.*

Plaintiff's job position as an adoption assistant/kennel attendant required her: (1) to clean the entire facility; (2) to care for all of the animals in the shelter; (3) to transport the dogs from the intake area to an empty cage; (4) to perform basic maintenance work on the facility, including mowing the lawn; (5) to pick up donated dog food from local merchants; (6) to monitor the health of the animals; (7) to assist with animal adoptions; and (8) on occasion, to lift objects heavier than 30 pounds. (Defendant's Ex. C). Plaintiff's job position also required her to work every third weekend.

Plaintiff submitted an affidavit in which she states that she could perform all of her

15

duties as an adoption assistant/kennel attendant except clean the blue trays in the puppy room and the surgery room. (Affidavit of Angelina Povey ("Povey Aff.") ¶ 5). She testified that although she cannot clean the entire facility by herself on the weekends, she can clean the facility with the help of her husband, a volunteer at the shelter. (*Id.* ¶ 7). She also testified that she can work on Saturdays by filling in for the office manager, (*id.* ¶ 8), and can "take out the trash and/or remove waste from the facility" if she is able to "moderate how much trash was put into each can before [she] disposed of it." (*Id.* ¶ 10).

Viewing Plaintiff's testimony in the light most favorable to her, the court concludes that Plaintiff is not able to perform the essential functions of her position as an adoption assistant/kennel attendant. Plaintiff admits that she is unable to clean the facility without the aid of a third party. The fact that she can fill in for the office manager on Saturdays does not help her case, since the duties of the office manager generally do not overlap with the duties of an adoption assistant/kennel attendant. (*See* Defendant's Ex. C) (exhibit contains job description of both adoption assistant/kennel attendant and office manager). And the fact that she can take out the trash so long as she the trash can is not filled to capacity only serves to highlight the fact that she is limited in her ability to lift heavy objects. In sum, Plaintiff's "accommodations" are not accommodations at all; rather, they are requests to eliminate certain essential functions of her job. *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 912 (7th Cir. 1996) (holding that plaintiff's request for a "helper" is not a reasonable accommodation because he would not be performing the essential functions of his position). Because Plaintiff fails to raise a genuine issue of

material fact as to whether she is a qualified individual with a disability, the court must **GRANT** the City's motion for summary judgment on Plaintiff's ADA disparate treatment and reasonable accommodation claims.

### B. Retaliation

The ADA prohibits retaliation for opposing or complaining about disability discrimination. *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1117 (7th Cir. 2001). To prove retaliation under the direct method, the plaintiff must offer evidence that: (1) she engaged in statutorily protected activity; (2) the defendant subjected her to an adverse employment action; and (3) a causal connection exists between the two events. *Id*. The parties dispute the third element.

Plaintiff complained about Hancock's "harassing" comments to Calabro. Calabro then employed Dawson, a former EEOC investigator, to conduct an investigation into the matter. Although Dawson did not find that harassment necessarily occurred, the City instituted a policy whereby Plaintiff and Hancock were not to have contact with one another. After Plaintiff's second complaint to Calabro, Calabro instructed Wilder to inform Hancock that if his comments did not stop, he would be fired. Plaintiff last complained about Hancock's comments on August 8, 2008, a few weeks before her termination. At some point during this general time frame, Plaintiff testified that Wilder threatened her job by informing her that "he had no problem firing employees." (Plaintiff Dep. at 46).

Plaintiff alleges that there is a causal connection between her complaints of

discrimination and her termination given the short time period between her last complaint and the City's decision to terminate her employment. She also alleges that Wilder's statement to her that "he had no problem firing employees," shortly after she complained of Hancock's harassment, is further proof of causation.

First, a short temporal sequence between her complaints of harassment and her termination is not enough, in and of itself, to show causation. *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010). Moreover, "to demonstrate a causal connection between the protected activity and an adverse employment action, a 'plaintiff must provide direct or circumstantial evidence that the decisionmaker has acted for a prohibited reason.'" *Long v. Teachers' Retirement Sys. of Illinois*, 585 F.3d 344, 351 (7th Cir. 2009) (quoting *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003)). Plaintiff relies on Wilder's statement to her ("he had no problem firing her") as circumstantial evidence that retaliatory animus motivated the City to terminate her. Wilder did not decide to terminate Plaintiff on his own; rather, Wilder, Calabro, the City Attorney, and a Human Resources consultant jointly agreed to terminate Plaintiff following a meeting during which the parties discussed whether Plaintiff could perform the essential functions of her position given her permanent lifting restrictions. (*See* Calabro Dep. at 41-44, 47-48, 108). Plaintiff has presented no evidence to suggest that Calabro, the City Attorney, and the Human Resources consultant were motivated by a retaliatory intent, or that they were influenced by Wilder's alleged animus. The court therefore finds no evidence to suggest a causal connection between her complaints of harassment and her termination. *See Fuka*

*v. Thomson Consumer Elecs.*, 82 F.3d 1397, 1403 (7th Cir. 1996) (where no nexus is shown between the remark and the employment decision in question, the remark alone "will not give rise to an inference of discrimination even when uttered by the ultimate decisionmaker").

**IV. Conclusion**

For the reasons set forth above, the court finds no genuine issue of material fact exists as to Plaintiff's ADA disparate treatment, failure to accommodate, and retaliation claims. Accordingly, the court **GRANTS** the City of Jeffersonville's Motion for Summary Judgment (Docket # 27).

**SO ORDERED** this 21st day of March 2011.

                                      RICHARD L. YOUNG, CHIEF JUDGE
                                      United States District Court
                                      Southern District of Indiana

Electronic Copies to:

Andrew Dutkanych III
BIESECKER & DUTKANYCH LLC
ad@bdlegal.com

Stacy K. Newton
RUDOLPH FINE PORTER & JOHNSON
skn@rfpj.com

Christopher S. Wolcott
BIESECKER DUTKANYCH & MACER, LLC
cwolcott@bdlegal.com